THE HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
8
AT SEATTLE
9
| | |
|---|---|
| TIFFANY HILL, individually and on behalf of all persons similarly situated, | CASE NO. C12-0717-JCC |
| Plaintiff, | ORDER |
| v. | |
| XEROX BUSINESS SERVICES, LLC, *et al.*, | |
| Defendants. | |

16    This matter comes before the Court on the parties' cross-motions for summary judgment

17  (Dkt. Nos. 240, 244) and motions to exclude expert testimony (Dkt. Nos. 241, 244).[1] Having

18  thoroughly considered the briefing and the relevant record, the Court finds oral argument

19  unnecessary[2] and hereby GRANTS in part Plaintiff's motion to exclude Mr. Boedeker's expert

20

21  [1] Defendants submitted a consolidated motion to exclude expert testimony and for summary judgment. (*See generally* Dkt. No. 244.)

22  [2] Plaintiff requested oral argument on her motion for summary judgment as well as that of Defendants. (Dkt. Nos. 240 at 1, 251 at 1.) The Court deems such argument unnecessary because

23  the parties have had a full opportunity to brief the motions. *See Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (oral argument not required if parties are given adequate opportunity to

24  submit papers in support of and/or opposition to the motion). Moreover, because the Court is ultimately denying both motions while simultaneously granting summary judgment *sua sponte* to

25  Plaintiff as to the issue of Defendants' noncompliance, Plaintiff cannot show prejudice from failing to present her arguments orally. *See Dredge Corp. v. Penny*, 338 F.2d 456, 462 (9th Cir.

26

testimony (Dkt. No. 241) and DENIES the parties' remaining motions (Dkt. Nos. 240, 244). The Court further *sua sponte* GRANTS Rule 56(f) summary judgment in favor of Plaintiff as to the issue of Defendants' noncompliance with the Washington Minimum Wage Act ("MWA"), RCW 49.46.005 *et seq*. The Court explains its reasoning herein.

## I.    BACKGROUND

As the Ninth Circuit Court of Appeals previously described it, this is a case involving a "mind-numbingly complex" payment plan to employees. *Douglas v. Xerox Business Services, LLC*, 875 F.3d 884, 885 (9th Cir. 2017). Nevertheless, because the parties persevere, so, too, does the Court. The Court has discussed the specific facts in previous orders. (*See generally* Dkt. Nos. 116, 221.) As such, it will only briefly summarize the pertinent ones here.

According to the operative complaint, Defendants operate call centers and compensate their employees based on the Achievement Based Compensation ("ABC") plan. (Dkt. No. 23 at 7.) In the simplest of terms, the ABC plan compensates call agents with different rates of pay based on the different tasks they perform. (*See* Dkt. No. 221 at 2.) For instance, "productive" tasks are compensated at a per-minute rate, whereas "non-productive" tasks are not directly compensated. (*Id*.) Instead, at the end of each workweek, Defendants total each call agent's compensation for productive tasks and then divide that amount by the total number of hours the agent worked for "productive" and "non-productive" tasks each week to determine the agent's *de facto* wage. (Dkt. No. 62 at 4–5.) Defendants then "cure" any difference between that *de facto* wage and the *de jure* (*i.e.*, legal) minimum wage with "subsidy pay." (*Id*. at 5.)

In 2012, Plaintiff Tiffany Hill brought this action on behalf of a class of similarly situated employees, alleging that Defendants' ABC plan violates the MWA. (*See generally* Dkt. No. 1.) The action has since gone through class certification and multiple rounds of summary judgment. (*See generally* Dkt. Nos. 116, 221.) In the first round, this Court denied Defendants' argument

---

1964) ("a district court may not . . . deny [a request for oral argument] . . . unless the motion for summary judgment is denied.").

that the ABC plan is a piecework one; instead, it found that the ABC plan is an hourly plan and that class members are therefore hourly workers. (*See* Dkt. No. 116 at 4–5.) Defendants appealed to the Ninth Circuit, who, in turn, certified the question to the Washington Supreme Court as to whether the ABC plan constituted a piecework one under Washington law. *See Hill v. Xerox Business Services*, LLC, 868 F.3d 758, 762–63 (9th Cir. 2017). The Washington high court then confirmed that Defendants' ABC plan is *not* a piecework one but did not explain how else to categorize it. *Hill v. Xerox Business Services, LLC*, 426 P.3d 703, 705 (Wash. 2018). Nevertheless, given that answer, the Ninth Circuit affirmed this Court's denial of Defendants' summary judgment argument that their employees are considered pieceworkers. *See Hill v. Xerox Business Services*, LLC, 771 F. App'x. 771, 772 (9th Cir. 2019). In the second round, this Court affirmatively granted summary judgment to Plaintiff on the categorization of the ABC plan as an hourly one. (Dkt. No. 221 at 5–6.)

The parties are now on their third round of summary judgment. The disputes in this round arise out of the Court's rulings in the previous round. In that round, the Court struck both parties' expert reports for failing to apply the proper methodology for measuring MWA compliance, and ordered the parties to submit revised expert reports. (Dkt. No. 221 at 10.) The parties have completed their revised expert and rebuttal reports and (a) move to exclude each other's revised reports and (b) once again seek summary judgment rulings based on the revised opinions. (*See generally* Dkt. Nos. 240, 241, 244.) Before the Court can reach the merits of summary judgment, it must ascertain the admissibility of the expert testimony on which both parties rely.

## II.    DISCUSSION

### A.    Motions to Exclude Expert Testimony (Dkt. Nos. 241, 244)

#### 1.    Legal Standard

Federal Rule of Evidence ("FRE") 702 confers upon the trial court a gatekeeping role to screen expert testimony for its relevancy and reliability. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Under that Rule, a trial court may permit a witness who is qualified as

an expert to testify in the form of an opinion if: (1) their scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) they have reliably applied the principles and methods to the facts of the case. *Id.* at 595 (citing Fed. R. Evid. 702).

While this inquiry is, notably, a flexible one, its focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594–95. Indeed, the Court's gatekeeping function is limited only to "ensur[ing] the reliability and relevancy" of expert testimony, *not* its reasonableness. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). That is, the Court may not preclude the admission of expert testimony based purely on "[t]he presence of opposing scientific tests or methods," as such presence speaks to the weight of the evidence, not its admissibility. *Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1242 (W.D. Wash. 2018) (quoting *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230–31 (9th Cir. 1998)). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. At bottom, "so long as the methods employed by the expert are scientifically valid, disagreement with the assumptions behind the methods or the methodology employed does not warrant exclusion." *Moussouris*, 311 F. Supp. 3d at 1242 (citing *S.E.C. v. Das*, 723 F.3d 943, 950 (8th Cir. 2013)).

2.    Mr. Stefan Boedeker

i.    *The Three "Sensitivities"*

Plaintiff contends that the Court should exclude Mr. Boedeker's report and testimony in their entirety. (Dkt. No. 241 at 11.) Her concern arises primarily with Mr. Boedeker's three so-called "sensitivities." (*See id*. at 12–15.)

Mr. Boedeker's three "sensitivities" are, essentially, various hypothetical calculations for damages and applicable offsets based on different timeframes underlying each "sensitivity."

(Dkt. No. 246 at 13; *see also* Dkt. No. 249 at 8) (Defendants represent the "sensitivities" as "scenarios"). Sensitivity 1 confines its calculations to units of "two-pay-periods," or every four weeks. (Dkt. No. 246 at 13.) That is, Sensitivity 1 reviews Defendants' wage payments to each individual employee for non-compliance at the pay period level (every two weeks), and then applies offsets in four-week increments, given evidence that offset payments were often delayed by one pay period. (*See id.* at 12–13.) Sensitivity 2 then renders its calculations across the entirety of a class member's employment. (*See* Dkt. No. 249 at 8.) And Sensitivity 3 calculates damages and applicable offsets across the entirety of the class, without distinguishing by timeframe or individual. (*See id.*)

Plaintiff argues that each of Mr. Boedeker's "sensitivities" uses the incorrect timeframe for applying offsets. (Dkt. No. 241 at 13–15.) The Court agrees for all but Sensitivity 1. As Plaintiff notes, Sensitivites 2 and 3 completely disregard any notion of a "relevant time frame" for assessing applicable offsets. (*See id.* at 14–15.) However, the Court previously ordered that, at minimum, whatever methods the experts use to calculate these numbers must necessarily "be linked to relevant time frames." (Dkt. No. 235 at 3.) Indeed, the Court specifically explained that Defendants are *not* entitled "to 'subtract *all* amounts paid from the total wages otherwise owed— regardless of the type of pay and its timing.'" (*Id.*) (quoting Court's prior summary judgment order (Dkt. No. 221 at 9)). But Sensitivities 2 and 3 do precisely that. Thus, they run counter to the Court's mandate.

Defendants explain that Sensitivities 2 and 3 are not intended "as opinions regarding potential damages." (Dkt. No. 249 at 9.) Instead, they are merely "economic considerations intended only to test the validity and reliability of Boedeker's proposed damages calculation, which is set forth in 'Sensitivity 1.'" (*Id.*) Nevertheless, Defendants argue that Sensitities 2 and 3 will assist the trier of fact in determining "whether the calculations of either party's expert fall within a reasonable mathematical range based on the available data." (*Id.*) Defendants ostensibly

maintain that Sensitities 2 and 3 pass FRE 702's relevancy test[3] despite not being alternative damages theories. This argument is self-contradicting. If Sensitities 2 and 3 are not "opinions regarding potential damages," then they cannot possibly "test the validity and reliability of Boedeker's proposed *damages* calculation." (*Id.*) (emphasis added). Either Sensitities 2 and 3 supply alternative proposed damages theories based on different possible relevant timeframes for offsetting, or they are wholly irrelevant because they "'do[] not relate to any issue in the case.'" *Daubert*, 509 U.S. at 591.

To be sure, any alternative damages theories would assist the factfinder with assessing damages and would therefore be relevant. But even if they were to satisfy 702's relevancy test, Sensitities 2 and 3 must also be reliable. *See Daubert*, 509 U.S. at 589. An opinion cannot be reliable if it lacks a fundamental premise. *See id.* at 590 (proposed expert testimony is reliable if it is "supported by appropriate validation—*i.e.*, 'good grounds'"). Here, Sensitities 2 and 3 fail to account for a relevant timeframe as required by the Court. (*See* Dkt. No. 235 at 3.) Sensitities 2 and 3 therefore lack "good grounds" and cannot support damages and applicable offsets in this case.[4] A defect as fundamental as this one nullifies the reliability of the opinion. The Court therefore EXCLUDES Sensitities 2 and 3 from Mr. Boedeker's report and any opinion testimony regarding the same.

Conversely and for the same reasons, the Court DECLINES to exclude Sensitivity 1. As noted, Sensitivity 1 adopts increments of "two-pay-periods," or every four weeks, as its relevant timeframe for offsetting. (Dkt. No. 246 at 13.) Plaintiff asserts that Mr. Boedeker's selected timeframe is unsupported by both law and fact. (Dkt. No. 241 at 13.) She submits that the

---

[3] FRE 702 requires that expert testimony assist "the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "This condition goes primarily to relevance." *Daubert*, 509 U.S. at 591.

[4] For instance, if Sensitities 2 and 3 had instead adopted, say, one- or two-week increments, as their relevant timeframes for offsetting, then they would satisfy the Court's conditions for these calculations.

appropriate timeframe is the workweek. (*Id*. at 11–13.) For reasons explained below, *see infra* Section II.B.3.i, the Court declines to adopt as a matter of law any specific timeframe as the "relevant time frame" for applying offsets. In turn, Mr. Boedeker's explanation that some offset payments occurred bi-weekly or were lagged reasonably justifies his use of a four-week timeframe. (*See* Dkt. No. 246 at 12.) As such, Plaintiff's concern amounts to no more than a "disagreement with the assumptions" behind Mr. Boedeker's chosen methodology. *Moussouris*, 311 F. Supp. at 1242. This is insufficient to warrant exclusion. *See id*.

### ii. *Method of Applying Offsets and Calculating Overtime*

Finally, Plaintiff challenges Mr. Boedeker's decision to apply offsets to minimum wage liability before calculating overtime liability. (Dkt. No. 241 at 15.) She asserts that Mr. Boedeker should have totaled up the minimum wage and overtime liability *before* applying any offsets, and that Mr. Boedeker's failure to do so warrants exclusion. (*Id*.) Defendants, in turn, argue that "[t]he proper framework for assessing compliance starts by determining whether there is a shortfall between the minimum wage owed and the compensation actually paid" before applying an overtime adjustment or premium. (Dkt. No. 249 at 20.) But Defendants' methodology finds no support in the law. Instead, the plain language of the MWA confirms that Plaintiff's methodology is the correct one.

The MWA's liability provision states that "[a]ny employer who pays any employee less than the amounts to which such employee is entitled *under or by virtue of this chapter*, shall be liable . . . for the full amount due . . . *under this chapter*, less any amount actually paid to such employee by the employer." RCW 49.46.090 (emphasis added). "[T]his chapter" connotes any provision under Title 49, Chapter 46 of the RCW. And Title 49, Chapter 46 of the RCW includes provisions for minimum hourly (RCW 49.46.020) and overtime (RCW 49.46.130) wages. Thus, per RCW 49.46.090's construction, an employer is liable to an employee for the full amount of unpaid minimum *and* overtime wages and therefore must calculate those totals *before* subtracting

"any amount actually paid" to the employee. *See* RCW 49.46.090.[5] As such, Mr. Boedeker's method of applying offsets before calculating overtime is contrary to law.[6]

Although this is a fundamental defect, it is not so fatal as to warrant complete exclusion. Instead, the Court ORDERS Defendants to submit a revised expert report that supplements Mr. Boedeker's opinion consistent with the instructions in Section III of this order. *See* Fed. R. Civ. P. 26(a)(2)(E), 26(e) (the court may order supplemental disclosures from experts). The Court otherwise GRANTS Plaintiff's motion (Dkt. No. 241) as it relates to Sensitivities 2 and 3, and DENIES the motion in all other respects.

       3.   <u>Dr. Jeffrey A. Munson</u>

Defendants similarly seek to exclude Dr. Munson's expert report and testimony in their entirety. (Dkt. No. 244 at 10.) They assert that complete exclusion is warranted on, broadly, two grounds: (1) Dr. Munson is not qualified to opine on MWA compliance or damages, and (2) his work product is so replete with errors as to be inadmissible. (*Id*. at 10–24.) The Court takes each argument in turn.

*i.  Dr. Munson's Qualifications*

FRE 702 contemplates a broad conception of expert qualifications. *See Thomas v. Newton*, 42 F.3d 1266, 1269 (9th Cir. 1994). Indeed, experts may be qualified through their "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. In elucidating these

---

[5] The Court also previously explained that Defendants may "subtract excess subsidy pay and non-subsidy pay . . . so as to avoid windfall" but only *after* "underpayments are determined." (Dkt. No. 235 at 3.) "Underpayments" include unpaid minimum *and* overtime wages.

[6] Relatedly, Mr. Boedeker cites to the Washington State Department of Labor & Industries' ("DLI") Admin. Policy ES.A.3 to support his method of applying offsets before calculating overtime. (*See* Dkt. No. 246 at 12–13.) In general, DLI promulgates guides and interpretations for how "the major labor laws under its jurisdiction should be applied." *Administrative Policies*, WASHINGTON STATE DEPARTMENT OF LABOR & INDUSTRIES, https://www.lni.wa.gov/workers-rights/workplace-policies/administrative-policies. But DLI Admin. Policy ES.A.3 does not explain the proper order of operations for calculating liability under the MWA. Instead, it merely explains how to generally determine "whether an employee has been paid the minimum wage." DLI ES.A.3 at 2. It is therefore insufficient to support Mr. Boedeker's methodology.

specific qualifications, FRE 702 treats as experts not just those persons who meet the definition in the strictest sense of the word, such as physicians or physicists, but also a larger category of individuals "sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values." *Id*. (advisory committee's notes to 1972 proposed rule). Ultimately, FRE 702 "is broadly phrased and intended to embrace more than a narrow definition of qualified expert." *Thomas*, 42 F.3d at 1269.

Defendants argue Dr. Munson's "formal education and purported expertise . . . is not, in any way, related to the issues of employment, compensation, and calculation of payment data." (Dkt. No. 244 at 19.) Dr. Munson is a research professor in psychiatry and behavioral sciences, with a bachelor's degree in psychology and a doctorate in child clinical psychology. (Dkt. No. 243-2 at 2–3.) True enough, these fields are unrelated to the issue of minimum wage compliance. Nevertheless, Defendants misconstrue the precise scope of Dr. Munson's work and overlook the skills and experience from which he draws.

Dr. Munson was not asked to opine on best practices or industry standards for wage and compliance issues; rather, he was tasked with "calculat[ing] damages for the time Class members spent performing work without compensation." (*Id*. at 11.) This requires synthesis of a vast amount of wage-related data pulled from Defendants' Front End Payroll System ("FEPS"). (*Compare* Dkt. No. 243-2 at 6, *with* Dkt. No. 246 at 7) (both experts worked with FEPS data to calculate compliance and damages). As such, the "minimal foundation" of skill or experience required of Dr. Munson as an expert is the ability to manage and interpret large datasets. *See Thomas*, 42 F.3d at 1269–70 (an expert need only possess "the minimal foundation of knowledge, skill, and experience" to be qualified); *see also Bluetooth SIG, Inc. v. FCA US LLC*, 468 F. Supp. 3d 1342, 1349 (W.D. Wash. 2020) (economist trained in survey research methods had "minimal foundation" necessary to critique a trademark litigation survey). And Dr. Munson meets this minimum requirement. Indeed, his own research "requires that [he] develop and manage large databases," and he "routinely oversee[s] data analyses and data management for

large, multi-project, collaborative studies." (Dkt. No. 243-2 at 3.) Thus, Dr. Munson possesses

the requisite minimal skill and experience for the specific task of calculating damages using a

large dataset, and is qualified to testify as an expert.[7]

### ii. Dr. Munson's Work Product

Defendants next contend that exclusion is warranted because Dr. Munson failed to follow

the Court's instructions on the proper method for calculating damages and offsets. (Dkt. No. 244

at 10–17.)[8] The Court agrees for some of Dr. Munson's calculations but not others. Namely, Dr.

Munson's application (or lack thereof) of non-subsidy pay and discretionary bonuses is contrary

to law, but he adequately applied the Court's instructions with respect to excess subsidy pay or

excess production minutes.

As to the latter, the Court understands Dr. Munson's methodology not as one that

completely disregards its instructions but rather as one that merely interprets the instructions in

an unfavorable manner for Defendants. For instance, Defendants argue that Dr. Munson "failed

to offset excess subsidy pay against alleged unpaid minutes." (*Id*. at 11.) That is a

mischaracterization. Indeed, Defendants themselves quote Dr. Munson's deposition, wherein he

states: "I make no effort to apply subsidy pay *to other weeks than the week it was . . . recorded*

---

[7] The Court further observes that Dr. Munson has served as a consultant and an expert in at least two different wage-and-hour cases "involving data analyses like those I was asked to perform in this case," thus affirming his qualifications. (*Id*. at 3.) Of course, Defendants contest the strength of this experience, too. (Dkt. No. 244 at 20–21.) They argue that Dr. Munson's prior experience "did not involve complex compensation plans" like the case at bar. (*Id*. at 20.) Even if true, this defect tests the weight of Dr. Munson's testimony, not its admissibility. *See Avila v. Willits Environmental Remediation Trust*, 633 F.3d 828, 839 (9th Cir. 2011) (so long as the expert's testimony is "'within the reasonable confines of his subject area,'" then any "lack of specialization goes to weight, not admissibility.") (citations omitted).

[8] Confusingly, Defendants isolate this argument from the remainder of their FRE 702 analysis, (*compare id*. at 10–17, *with* 17–24), thus suggesting that FRE 702 and *Daubert* do not apply to this argument. But FRE 702, *Daubert*, and their progeny are the foremost standards under which the Court may review admissibility of expert testimony. Moreover, any failure to follow the Court's instructions inevitably bears on the reliability of the evidence. *See supra* section II.A.2.i; *see also Daubert*, 509 U.S. at 589. As such, the Court will continue to review this argument under the FRE 702/*Daubert* standard.

*for the employee*." (*Id.*) (quoting Dkt. No. 245 at 41) (emphasis added). In other words, Dr. Munson did, in fact, apply excess subsidy pay—but he did so on a workweek basis and not on a four-week basis, as Defendants might have liked. (*Compare* Dkt. No. 243-2 at 6, *with* Dkt. No. 246 at 12–13) (Dr. Munson's calculations adopts a workweek timeframe, whereas Mr. Boedeker's uses a four-week timeframe).[9] Similarly, with respect to Dr. Munson's "failure" to treat "excess production minutes" as an offset, (Dkt. No. 244 at 15), Plaintiff provides a perfectly reasonable explanation. That is, she disputes their existence and argues that "until now, Defendants have never raised this as a form of offsetting compensation." (Dkt. No. 251 at 24–25.) These explanations do not indicate a complete disregard for the Court's instructions. In turn, Defendants' push for exclusion on this basis speaks to the weight of Dr. Munson's testimony, not its admissibility. *See Khadera v. ABM Indus. Inc.*, 2011 WL 6813454, slip op. at 3–4 (W.D. Wash. 2011).

That said, Defendants' objection that Dr. Munson failed to properly offset non-subsidy pay or discretionary bonuses is well taken. They argue that Dr. Munson "failed to credit 'any amounts actually paid'," as required by the Court's order (Dkt. No. 235 at 3), because Dr. Munson offset non-subsidy pay on a proportional basis[10] (as opposed to in whole) and excluded discretionary bonuses altogether. (Dkt. No. 244 at 12–15.) The Court agrees. In fact, there is no basis in law for these calculation decisions. Instead, they contravene (a) the Court's prior mandate that the parties may include any amounts actually paid as an offset, so long as linked to a relevant timeframe, (*see* Dkt. Nos. 221 at 9–10, 235 at 3), and (b) the MWA's exceptionally

---

[9] Dr. Munson further explained that "excess" subsidy pay only appeared in workweeks without any damages—that is, where Defendants were already compliant. (*See* Dkt. No. 243-2 at 14.) As such, there were no damages to offset in these workweeks to begin with. (*See id.*)

[10] Dr. Munson's proportional method proceeds as follows. Say a class member worked eight total hours in a day, with one of those hours being unpaid. The proportion of unpaid work hours is then 1/8. If that class member received $8 that day in non-subsidy pay, then, based on the proportional method, only 1/8 of that $8 (*i.e.*, $1) would actually be eligible for offsetting. (Dkt. No. 243-2 at 17.)

broad language that requires parties to subtract "*any amount actually paid*" when calculating

damages, RCW 49.46.090(1) (emphasis added).[11] Nevertheless, as with the deficiencies in Mr.

Boedeker's report, this is insufficient to warrant complete exclusion. Instead, the Court

ORDERS Plaintiff to submit a revised expert report that supplements Dr. Munson's opinions

consistent with the Court's instructions in Section III of this order. *See* Fed. R. Civ. P.

26(a)(2)(E), 26(e).

Finally, Defendants also maintain that exclusion is warranted because Dr. Munson's

work is filled with numerous errors,[12] rests on improper assumptions supplied to him by

Plaintiff's counsel,[13] and is altogether unreliable. (Dkt. No. 244 at 21–24.) While concerning,

these deficiencies—to the extent they may be considered as such—are better fit for cross-

examination, not exclusion. *See Bluetooth SIG, Inc.*, 468 F. Supp. 3d at 1349 (expert's reliance

on materials that "lacked basis in any data" and his failure to "fully read some of the materials

that he relied on" did not warrant exclusion); *see also Moussouri*, 311 F. Supp. 3d at 1243

(expert's omission of a mathematical function from his calculations did not warrant exclusion

where the function was not required in all circumstances). In other words, though these

---

[11] Notably, this issue arises again in the parties' cross-motions for summary judgment. *See infra* Section II.B.3.ii.

[12] For instance, Dr. Munson concedes that he included data for employees who were ineligible to be part of the class. (Dkt. No. 244 at 21) (quoting Dr. Munson's deposition, Dkt. No. 245 at 34). Elsewhere, Dr. Munson admits to referencing the overtime multiplier in the incorrect paragraph of his report. (Dkt. No. 245 at 51) ("1.5 times" should have appeared in Paragraph 29 of Dr. Munson's report instead of Paragraph 28).

[13] But "an expert's reliance on information provided by the parties does not necessitate the exclusion of testimony." *Anstead v. Virginia Mason Med. Ctr.*, 2023 WL 4637316, slip op. at 3 (W.D. Wash. 2023). Instead, so long as the assumptions and interpretations find some support in the record, such reliance ultimately bears on weight, not admissibility. *Khadera*, 2011 WL 6813454, slip op. at 3–4. Defendants submit that Dr. Munson's reliance on assumptions provided by Plaintiff's counsel led him to disregard excess production pay, excess subsidy pay, and non-subsidy pay. (Dkt. No. 244 at 10.) As discussed in this Section, though Dr. Munson's treatment for some of these payments is contrary to law, others find support in the record. As such, the Court is satisfied that Dr. Munson's work, even if reliant on information from counsel, is sufficiently supported by the record to overcome complete exclusion.

deficiencies may reduce the weight of Dr. Munson's report and testimony, they do not justify complete exclusion. The Court therefore DENIES Defendants' motion to exclude Dr. Munson (Dkt. No. 244).

## B.    Motions for Summary Judgment (Dkt. Nos. 240, 244)

### 1.    Legal Standard

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the facts in the light most favorable to the nonmoving party and resolves ambiguity in that party's favor, but it must not make credibility determinations or weigh evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 255 (1986); *Bator v. Hawaii*, 39 F.3d 1021, 1026 (9th Cir. 1994). A fact is material if it "might affect the outcome of the suit," and a dispute of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted). However, conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990). In turn, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The parties' cross-motions raise a host of issues on summary judgment, which fall into two broad categories of questions: (1) whether Defendants are liable for violating the MWA (*i.e.*, have they complied with the MWA); and (2) what is the extent of Defendants' liability, if any, under the MWA (*i.e.*, how to calculate damages).

2.    Defendants' Liability—Rule 56(f) Judgment

Defendants move for summary judgment on both the issue of compliance and the ultimate damages amount. (*See* Dkt. No. 244 at 24.) Plaintiff moves only for summary judgment as to damages and treats Defendants' noncompliance with the MWA as a given. (*See generally* Dkt. No. 240.) But as the Court previously explained, it has not yet ruled on the issue of MWA compliance. (Dkt. No. 257 at 2.) That said, in rare circumstances, a district may issue summary judgment *sua sponte. See* Fed. R. Civ. P. 56(f). Indeed, a court may "grant summary judgment for a nonmovant" or "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f)(1), (3). *Sua sponte* summary judgment may be especially appropriate where the movant has had "'full and fair opportunity to ventilate the issued involved.'" *Albino v. Baca*, 747 F.3d 1162, 1177 (9th Cir. 2014) (quoting *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311, 312 (9th Cir.1982)). However, before doing so, a court must notify the parties of its intent to issue summary judgment *sua sponte* and provide them with a reasonable time to respond. *See* Fed. R. Civ. P. 56(f). The Court has provided such notice, (*see generally* Dkt. No. 257), and now finds summary judgment on the issue of MWA compliance warranted under Rule 56(f).

The MWA requires employers to pay their employees at least the minimum wage per hour for all working time. RCW 49.46.020(1)–(3); *see also* DLI Admin. Policy ES.D.1 at 5 ("Employees must be paid for all time worked").[14] An employer who fails to compensate its employees the minimum wage for "all time worked" therefore fails to comply with the MWA. (Dkt. No. 221 at 7) (quoting DLI Admin. Policy ES.D.1 at 5). And any failure to comply with the MWA would naturally result in a minimum amount of damages—that is, the difference between the wages paid to the employees and what they should have been paid to achieve minimum

---

[14] Under Washington law, the Court must defer to the state agency's interpretation of a statute within that agency's expertise. *Alvarez v. IBP, Inc.*, 339 F.3d 894, 911 (9th Cir. 2003), *aff'd*, 546 U.S. 21 (2005) (citations omitted).

wage, less any other amounts "actually" paid. *See* RCW 49.46.090(1) ("Any employer who pays any employee less than the amounts to which such employee is entitled . . . *shall be liable to such employee* affected for the full amount due . . . less any amount actually paid to such employee by the employer." (emphasis added)).

Even after reviewing the parties' supplemental briefings (Dkt. Nos. 259, 260), the Court fails to see any genuine dispute as to Defendants' violation of the MWA. Both parties' expert reports demonstrate Defendants owe *some* amount of damages. (*See* Dkt. No. 257 at 2) (citing damages calculations in expert reports). Logic dictates that an MWA violation is a prerequisite to MWA damages. *See generally* RCW 49.46.090(1). And if both experts find a non-zero amount of damages, then there is no genuine dispute of material fact as to Defendants' noncompliance with the MWA. (*Compare* Dkt. No. 243-2 at 11, *with* 246 at 14) (Dr. Munson equates damages with "unpaid time," whereas Mr. Boedeker characterizes them as "compliance level calculations"). This analysis remains unchanged even in light of the Court's request above for supplemental expert reports.[15]

Defendants' arguments to the contrary are unconvincing. For instance, Defendants note that Dr. Munson concedes there is "no violation when weeks included a piece rate unit." (Dkt. No. 259 at 4.) But any reference to piecework payment is wholly irrelevant. Indeed, the Washington Supreme Court explicitly held that the ABC plan is not a piecework plan. *Hill*, 426 P.3d at 705 ("An employer's payment plan that includes as a metric an employee's 'production

---

[15] Indeed, should Mr. Boedeker properly revise his work to calculate overtime damages before applying offsets, his final damages number would necessarily increase. (*See* Dkt. No. 243-3 at 12) (Mr. Boedeker's decision to apply offsets before calculating overtime damages "result[ed] in reductions to damages that are larger than the offsetting amounts being applied"). Similarly, should Dr. Munson properly apply offsets per the Court's order, his overall damages number would decrease, but it would not be nonexistent. For instance, assuming (purely for the sake of argument) that the Court were to accept Defendants' total offset amount of $3,778,985, (*see* Dkt. No. 244 at 25), and subtract that full amount from Plaintiff's current damages total of $4,009,540.29 (which already includes some offsets), Plaintiff would still maintain damages in the amount of $230,555.29. And even then, this is the extreme low end of the damages spectrum.

minutes' does not qualify as a piecework plan"). And this Court twice explained that the class

members here are hourly workers—not piecework ones. (*See* Dkt. Nos. 116 at 4–5, 221 at 5–6.)

That Defendants continue to invoke frivolous piecework arguments is, at this point, *beyond*

obtuse. (*See* Dkt. No. 221 at 5) (describing Defendants' prior argument as reflecting "an obtuse

failure to accept multiple rulings" on the characterization of the ABC plan). Defendants further

posit that "to the extent a workweek is averaged, [they are] in compliance with the MWA." (Dkt.

No. 259 at 4.) But the Court disclaimed workweek averaging when it ruled that compliance

should be measured by aggregating total minutes per day or week worked. (*See* Dkt. No. 221 at 8

n. 9) (workweek averaging "is a method of payment reserved for non-hourly workers," of which

this Class is not). As such, these arguments are irrelevant, and certainly fail to demonstrate a

genuine dispute.

Defendants also argue that a genuine dispute remains because, in following the Court's

methodology, Mr. Boedeker found a significant number of "compliant" class members. (*See* Dkt.

No. 259 at 6.) That is, Mr. Boedeker found (1) "at least 761 class members [who] have no claim"

under Sensitivity 1, and (2) "as many [as] 2,402 (*i.e.*, over 50%) [who] have no claim" under

Sensitivities 2 and 3. (*Id.*) As to the first point, the Court concedes that, at least under Mr.

Boedeker's Sensitivity 1 analysis, Defendants' payments to some 16% of class members are

fully compliant with the MWA. (Dkt. No. 246 at 14) (761 out of 4,794 class members, or

15.87%, are fully compliant under Sensitivity 1). Nevertheless, this does not raise a genuine

dispute as to Defendants' *overall* compliance—particularly where Defendants' payments still

violate the MWA for 84% of class members. As to the second point, Defendants' argument is

inherently inconsistent. They contend that as many as 2,402 class members have no claim if the

Court applies Sensitivity 2 or 3; but they elsewhere assert that Sensitivities 2 and 3 are not

"opinions regarding potential damages," (Dkt. No. 249 at 9). Both cannot be true. It cannot be

that 2,402 class members have no damages, when the calculations done to reach that number

have no bearing on damages to begin with. *See supra* Section II.A.2. In any event, the Court has

excluded all evidence pertaining to Sensitivites 2 and 3. *See id*. Thus, Defendants cannot

demonstrate a genuine dispute of material fact as to their noncompliance.

The Court therefore GRANTS Rule 56(f) judgment to nonmovant Plaintiff on the issue of

MWA compliance.

> 3.     The Extent of Defendants' Liability

Having determined that Defendants are liable for MWA violations, the Court next

assesses the extent of Defendants' liability. In other words, the Court addresses the question of

how to calculate damages and apply offsets under the MWA. The parties dispute the proper

method of operationalizing the MWA's liability provision, which states:

> Any employer who pays any employee less than the amounts to which such
> employee is entitled under or by virtue of this chapter, shall be liable to such
> employee affected for the full amount due to such employee under this chapter,
> less any amount actually paid to such employee by the employer.

RCW 49.46.090(1). Previously, in applying this provision to the case at bar, the Court explained

that Defendants' liability may be calculated by first determining "the overall MWA damages"

(*i.e.*, underpayments of minimum and overtime wages), *and then* subtracting from that total "any

amount[s] actually paid" (*i.e.*, the offsets) so as to avoid windfall. (Dkt. No. 235 at 3.) The Court

further refined these instructions by explaining that any offsets must be "linked to relevant time

frames by expert testimony." (*See id.*) At issue for the parties is what constitutes the "relevant

time frame" and "amount[s] actually paid."[16] The Court takes each in turn.

---

[16] Also at issue is who bears the burden of proving the offsets. Plaintiff asserts that offsets are an affirmative defense, such that Defendants must prove their entitlement thereto. (*See* Dkt. No. 240 at 17.) In turn, Defendants argue that Plaintiff bears the burden of proving her damages, and that offsets are part and parcel of a prima facie damages calculation. (Dkt. No. 248 at 12.) The Court agrees. Indeed, the Supreme Court of Washington previously explained that RCW 49.46.090(1) "sets the *statutory measure of damages* for minimum wage violations by mandating that an employer . . . be liable to [an] employee 'for the full amount of such wage rate, *less any amount actually paid to such employee* by the employer . . .'." *Seattle Professional Engineering Employees Ass'n v. Boeing Co.* ("*SPEEA*"), 901 P.2d 1126, 1132 (Wash. 2000) (emphasis added). Because Plaintiff bears the burden of proving damages, and because RCW 49.46.090(1)

1

*i. Relevant Timeframe for Offsets*

2

As a threshold matter, the Court clarifies that the "relevant time frame for applying

3

offsets" is a factual question, not a legal one.[17] But as the Court previously explained, "wages

4

comprising the 'amount actually paid'" must be "linked to relevant time frames *by expert*

5

*testimony*." (Dkt. No. 235 at 3) (emphasis added). The "relevant time frame" for applying offsets

6

is, therefore, a factual question. The Court would not have sought expert opinion on this issue if

7

it were a question of law.

8

It is imperative to clarify an important distinction. The "relevant time frame" for

9

assessing offsets is *separate* from the proper timeframe for measuring compliance. As to the

10

latter, the proper timeframe for generally gauging compliance is, indeed, a legal assessment—

11

specifically, one rooted in statutory interpretation. *See Carranza v. Dovex Fruit Company*, 416

12

P.3d 1205, 1210 (Wash. 2018) (in interpreting RCW 49.46.020(1)–(3), the court concluded that

13

the MWA requires employers to pay at least minimum wage "for each individual hour worked"

14

for non-piecerate tasks, rather than allow for workweek averaging); *see also Douglas*, 875 F.3d

15

at 886 (that the workweek is the proper "unit of measure" for gauging compliance with the Fair

16

Labor Standards Act's (FLSA) minimum-wage provision is a "pure question of statutory

17

interpretation"). But the Court has already resolved that legal issue. Indeed, in determining the

18

proper unit of measure for assessing compliance, it concluded that the MWA's "per hour"

19

standard applies and that, specifically, the parties must use the minute aggregation method to

20

measure Defendants' compliance levels. (*See* Dkt. No. 221 at 6–8.)

21

The parties' present dispute is not one of statutory interpretation. Instead, the problem is

22

that the parties cannot easily apply the MWA's liability provision, RCW 49.46.090(1), to the

23

─────────────────────

24

outlines the "statutory measure of damages," it naturally follows that Plaintiff must prove each
component—including the offsets.

25

[17] Plaintiff contends that this is a question of law. (Dkt. No. 240 at 16.) Defendants, though they

26

disagree with Plaintiff in all other respects, do not dispute this basic contention. (*See generally*
Dkt. No. 248 at 14–19.)

facts of this case because the facts are hopelessly convoluted. As Plaintiff noted, in theory, subtracting the "amount[s] actually paid" would be a very simple calculation.[18] However, given Defendants' "mindnumbingly complex" compensation plan, *see Douglas*, 875 F.3d at 885, what should be a very simple calculation becomes a needlessly complicated one. But that does not make it a purely legal question. In other words, that the parties cannot ascertain how to apply the statute to the facts of this case does not render it a legal question for the Court to answer.

To that end, the Court finds that a genuine dispute exists as to what properly constitutes the "relevant time frame" for applying offsets. Plaintiff's expert, Dr. Munson, employed a "workweek" timeframe. (*See* Dkt. No. 243-2 at 15) ("I was asked to assume that compensation . . . should serve to offset damages sustained in the same workweeks in which the compensation was entered.").[19] In contrast, Defendants' expert, Mr. Boedeker, concluded that the pay period was the most relevant timeframe "based on the referenced guidance, the FEPS data, and a review of wage statements of Washington based employees." (Dkt. No. 246 at 56.) A reasonable factfinder might find either timeframe convincing. The Court therefore DENIES Plaintiff's motion for summary judgment as to the question of the relevant timeframe for applying offsets.

---

[18] Indeed, borrowing Plaintiff's example, the calculation would normally proceed as follows:

> Assume that the minimum wage rate is $10 per hour, that Acme Corp. employed Jane Doe for forty hours in a workweek, and that Acme paid Ms. Doe $3 per hour for each hour of work. Because Acme undoubtedly paid Ms. Doe "less than the amounts to which [she] is entitled," Acme is "liable" to Ms. Doe "for the full amount due" ($10/hour) "less any amount actually paid" ($3/hour), which works out to $7 per hour. For the workweek in question, the total amount to which Ms. Doe is entitled under the MWA is $280 ($7 * 40 = $280).

(Dkt. No. 240 at 19.)

[19] Of course, Dr. Munson adopted this approach at the advice of counsel. (*See id*.) Nevertheless, as the Court previously explained, Dr. Munson's reliance on assumptions or facts given to him by counsel ultimately speaks to the weight of the evidence, not its admissibility, and certainly not the fact of its existence. *See supra* n. 12, *see also Khadera*, 2011 WL 6813454, slip op. at 3–4 (contrasting issue of weight of evidence to its admissibility).

1

*ii.  Amounts "Actually Paid"*

2

Finally, the parties cross-move for summary judgment as to what properly constitutes an

3

offset and what are the proper methods of applying them. In particular, Defendants seek

4

summary judgment as to the amounts of excess subsidy and non-subsidy pay available for

5

offsetting. (Dkt. No. 244 at 25.) Meanwhile, Plaintiff seeks summary judgment (1) that the

6

proper method of applying non-subsidy pay is the "proportional" method, and (2) that

7

discretionary bonuses do not qualify for offsetting because they are not wages. (Dkt. No. 240 at

8

22–24.)

9

Again, Plaintiff's arguments run contrary to law. *See supra* Section II.A.3.ii. For one, the

10

Court's prior conclusions preclude the "proportional" method. Indeed, the Court reasoned that

11

"employers may deduct amounts paid from the overall MWA damages, even if such amounts

12

were not explicitly intended for the underpaid time at issue." (Dkt. No. 235 at 3.) In other words,

13

contrary to Plaintiff's assertions, Defendants need not "prove that these [non-subsidy] payments

14

were intended solely to compensate class members for nonproduction work hours," (Dkt. No.

15

240 at 23), in order to apply them as offsets.

16

Moreover, Plaintiff's argument that discretionary bonuses should not be considered as

17

offsets because they are not wages misses the mark. There is no requirement under the MWA

18

that only wages may be considered an "amount actually paid." *See* RCW 49.46.090(1). Instead,

19

Plaintiff conflates the application of discretionary bonuses in rebate cases with their application

20

in minimum wage cases. (*See* Dkt. No. 240 at 22) (citing to *Covington v. Wise*, 2024 WL

21

1252425, slip op. at 5 (W.D. Wash. 2024), and *LaCoursiere v. CamWest Dev., Inc.*, 339 P.3d

22

963, 968 (Wash. 2014), both of which involve claims arising out of Washington's Wage Rebate

23

Act (WRA), RCW 49.52.050, and not the MWA). But the WRA and the MWA protect an

24

employee's right to compensation in different ways. *See SPEEA*, 901 P.2d at 1132 (the MWA

25

"merely sets the floor below which the agreed rate cannot fall without violating the statute,"

26

whereas the WRA "reinforce[s] contract obligations to pay above minimum wage rates"). Even

more tellingly, the WRA's penalty provision specifically refers to "wages," RCW 49.52.050, while the MWA's liability provision more broadly refers to "amount[s] actually paid," RCW 49.46.090(1). Thus, any analogy to damages calculations under the WRA is unpersuasive because the WRA and the MWA "clearly differ in their plain language." *Carranza*, 416 P.3d at 1212 (court declined to apply FLSA analysis to MWA where the relevant provisions "clearly differ[ed] in their plain language," even though it is well established that the MWA is based on the FLSA). To that end, the Court declines to apply the offset analysis for discretionary bonuses under the WRA to those in the case at bar.

As for the remaining contested forms of offsets (that is, excess subsidy pay and excess production minute pay), the Court observes that the parties' disputes are based in fact, not in law. They contest, for instance, whether excess subsidy payments even constitute offsets if they only appear in workweeks without damages. But this necessarily depends on whether the offset calculations apply a workweek or pay-period timeframe. (*Compare* Dkt. No. 240 at 13–14, *with* Dkt. No. 248 at 14) (if applying a workweek timeframe for offsets, then there are no excess subsidy payments to offset; if applying a pay-period timeframe, then some excess subsidy pay may count as offsets). And as noted above, the relevant timeframe for offsets is a factual question, not a legal one. *See supra* Section II.B.3.i. The same goes for the parties' dispute over whether it is proper for the experts to either include or exclude excess production minute pay. (*Compare* Dkt. No. 248 at 9, *with* Dkt. No. 255 at 12.) Not only is this a factual issue, but as the Court explained, it *specifically* speaks to the weight of the experts' opinion. *See Khadera*, 2011 WL 6813454, slip op. at 3–4 (so long as the expert opinion finds some support in the record, the quality of their work product ultimately bears on weight, not admissibility); *see also supra* Section II.A.3.ii. In turn, genuine disputes of material fact exist as to both categories of numbers, as both parties put forth conflicting expert opinions. (*Compare* Dkt. Nos. 243-2, 243-3, *with* Dkt. No. 246) (compare Dr. Munson's expert report and rebuttal report with Mr. Boedeker's consolidated expert and rebuttal reports).

1    In sum, the Court DENIES Plaintiff's motion for summary judgment with respect to the

2    use of the proportional method and the exclusion of discretionary bonuses. Similarly, because the

3    Court has ordered supplemental expert reports from Dr. Munson and Mr. Boedeker, the Court

4    declines to grant summary judgment to Defendants on their proposed figures for non-subsidy pay

5    and discretionary bonus offsets given that the factual record is still incomplete. The Court

6    therefore DENIES Defendants' request for summary judgment as to these figures. Finally, the

7    Court DENIES both parties' requests for summary judgment on the proper treatment of excess

8    subsidy pay and excess production minute pay.

9    **III.    CONCLUSION**

10    For the foregoing reasons, the Court ORDERS as follows:

11    • Plaintiff's motion to exclude Dr. Boedeker's expert testimony (Dkt. No. 241) is

12       GRANTED as to Sensitivities 2 and 3, and DENIED as to the rest.

13       ○ Furthermore, Mr. Boedeker is ORDERED to submit a supplemental report

14          that recalculates the compliance and damages numbers under Sensitivity 1

15          consistent with the methodology set out in Section II.A.2.ii. Defendants shall

16          submit this supplemental report to the Court within fourteen (14) days of this

17          Order. Plaintiff shall have seven (7) days to submit a rebuttal report and

18          another five (5) days to file a FRE 702/*Daubert* motion. Plaintiff's FRE

19          702/*Daubert* motion, if filed, must be narrowly tailored to address only the

20          opinions in Mr. Boedeker's supplemental report. Lastly, if filed, the motion

21          must follow the briefing schedule set out in LCR 7(d)(2) (14-Day Motions).

22    • Defendants' motion to exclude Dr. Munson's expert testimony (Dkt. No. 244) is

23       DENIED.

24       ○ However, Dr. Munson is ORDERED to submit a supplemental report that

25          diposes of the proportional method for applying offsets, incorporates

26          discretionary bonuses, and recalculates damages accordingly per the Court's

reasoning in Sections II.A.3.ii and II.B.3.ii. Plaintiff shall submit this
supplemental report to the Court within fourteen (14) days of this Order.
Defendants shall have seven (7) days to submit a rebuttal report and another
five (5) days to file a FRE 702/*Daubert* motion. Defendants' FRE
702/*Daubert* motion, if filed, must be narrowly tailored to address only the
opinions in Dr. Munson's supplemental report. Lastly, if filed, the motion
must follow the briefing schedule set out in LCR 7(d)(2) (14-Day Motions).

- The Court GRANTS Rule 56(f) judgment *sua sponte* in favor of Plaintiff as to the issue of Defendants' noncompliance with MWA.

- The Court DENIES the cross-motions for summary judgment (Dkt. Nos. 240, 244).

- Within thirty (30) days of this Order, the parties shall submit a joint status report (JSR) explaining (1) whether this case will be ready for bench trial on June 9, 2025, and (2) what outstanding issues remain to be decided at trial. The parties are not to argue the issues in the JSR except for where there is a dispute as to the actual existence of an issue. The JSR will not be a substitute for the pretrial order.

DATED this 21st day of March 2025.


John C. Coughenour
UNITED STATES DISTRICT JUDGE